UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,      )
                               )
               Plaintiff,      )
                               )
        vs.                    )      File No. 1:17-cr-170
                               )
Kevin D. Wanner,               )
                               )
               Defendant.      )


TRANSCRIPT OF SENTENCING


Taken at
United States Courthouse
Bismarck, North Dakota
July 23, 2018


BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

APPEARANCES

MR. NICHOLAS W. CHASE
U.S. Attorney's Office
Quentin N. Burdick United States Courthouse
655 First Avenue North, Suite 250
Fargo, North Dakota 58102-4932

FOR THE UNITED STATES

- - - - - - - - - -

MR. JEFFREY S. WEIKUM
Attorney at Law
1715 Burnt Boat Drive
Madison Suite
Bismarck, North Dakota 58503

FOR THE DEFENDANT

- - - - - - - - - -

Mark Wanner Statement - Page 5

Oscar Lundquist Statement - Page 8

Lisa Voeller
     Direct by Mr. Weikum - Page 10
     Cross-Examination by Mr. Chase - Page 23
     Redirect by Mr. Weikum - Page 30

Mike Booke Statement - Page 31

- - - - - - - - - -

Certificate of Court Reporter - Page 66

- - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2     Honorable Daniel L. Hovland, United States District Court

3     Judge, presiding, commencing at 11:00 a.m., Monday, July 23,

4     2018, in the United States Courthouse, Bismarck, North Dakota.

5     The following proceedings were had and made of record in open

6     court with the defendant present.)

7                    - - - - - - - - - - -

8          THE COURT:  We'll open the record in the case of

9     United States of America versus Kevin Wanner.  Here on behalf

10    of the federal government is Assistant U.S. Attorney Nick

11    Chase.  Representing the defendant here is Attorney Jeff Weikum

12    from Bismarck.  Mr. Wanner, how are you today, sir?

13         THE DEFENDANT:  All right.

14         THE COURT:  This is scheduled as a sentencing hearing

15    on two counts.  Count 1 is mail fraud.  Count 2 is money

16    laundering.  Before today I have reviewed the Presentence

17    Investigation Report rather carefully.  I have reviewed

18    sentencing memorandums and attached exhibits from both

19    attorneys.  I've also reviewed a multitude of letters of

20    support for Mr. Wanner and letters submitted by victims.  I've

21    read all of those letters twice.

22         I've gone back and reviewed my notes from a previous

23    hearing where we heard from a number of victims, approximately

24    five or six that had testified.  Anything else that's been

25    submitted by either party that I have not mentioned?

3

1          MR. CHASE:  No, Your Honor.

2          MR. WEIKUM:  No, Your Honor.

3          THE COURT:  All right.  And, Mr. Wanner, were you

4     given the opportunity to review the Presentence Investigation

11:02   5     Report?

6          THE DEFENDANT:  Yes, I was.

7          THE COURT:  You've discussed that with your attorney?

8          THE DEFENDANT:  Yes, I did.

9          THE COURT:  Either counsel have any objections to the

11:02   10    facts contained in the Presentence Report or the sentencing

11    guideline calculations?

12         MR. CHASE:  No, Your Honor.

13         MR. WEIKUM:  Other than as stated in the PSI, no,

14    Your Honor.

11:02   15         THE COURT:  All right.  Are there witnesses that

16    intend to testify for both sides?

17         MR. CHASE:  Your Honor, the only witnesses I have is

18    -- I know that there are some victims here who may want to say

19    a few things.  I don't expect to call them to the stand.  I

11:02   20    don't know how Your Honor does that normally.  I think there

21    are a few people who want to say something.  I don't expect to

22    be asking them questions.  I think they'd want to maybe want to

23    say something.

24         THE COURT:  Sure.  How many witnesses?

11:03   25         MR. CHASE:  I think maybe there -- there could be two

4

1    or three.

2                THE COURT:  Okay.  Then, Mr. Weikum, you have some

3    witnesses?

4                MR. WEIKUM:  I have two, Your Honor.  Well, actually,

11:03  5    one of them is a victim, who is going to be testifying at the

6    time that Mr. Chase requests if anybody has anything to say.

7    Other than that I have Lisa Voeller, who is the addiction

8    counselor for Mr. Wanner.

9                THE COURT:  Okay.

11:03  10               MR. WEIKUM:  That's it.

11               THE COURT:  Well, Mr. Chase, let's hear from the

12    witnesses that the government wishes to call.  We'll just have

13    them -- they don't need to be sworn in, but we'll just have

14    them take the stand, and they can read a statement or say

11:03  15    whatever they wish to say.

16                If you could just come forward, sir, and we'll have

17    you sit in the witness stand, if you could just identify

18    yourself and spell your name for the record when you get up

19    there and sit down, and then I'll turn it over to Mr. Chase.

11:04  20               MR. MARK WANNER:  My name is Mark Wanner.

21               THE COURT:  W-a-n-n-e-r?

22               MR. MARK WANNER:  Exactly.

23               THE COURT:  All right.  Mr. Chase.

24               MR. MARK WANNER:  Well, I had to write this down

11:04  25    because I didn't know if I'd get it straight off the -- off or

5

1   not.  But, Kevin, I and my father still find this hard to

2   believe.  I'm here today without him because he's too

3   embarrassed by what you had done.  My parents, hard-working

4   German-Russian people that started from scratch.  My mother

5   passed away in 2012, so it's just my father and me.  I am the

6   only child.  Taking money from my parents is taking money from

7   me.

8          My father has been a full-time working barber in the

9   state of North Dakota since 1956.  He will be 88 years old on

10  Friday.  He is still working to this day because that's what he

11  knows how to do.  And you can talk him into giving you

12  thousands of dollars you're supposed to be investing and use it

13  for your own personal use, you son of a bitch.  Some of what

14  goes through my head is if you would have legitimately invested

15  this money, what would it be worth today?

16         My parents have always tried to teach me to do the

17  right things, and my parents trusted you.  You were like a

18  piranha in a goldfish tank that looked like a goldfish.  I'm

19  damn glad you got caught.  We all struggle to make ends meet,

20  and you're out doing this.  My dad has a hard time talking

21  about this because of pride, and like any dad that cares, he

22  doesn't want me to know that he screwed up, but how was he to

23  know?  How were any of us to know?

24         You had your fun.  Now it's time, you got to pay the

25  piper.  No wonder when I asked you to check into investing oil,

6

1   you never did.  You would have been much better off today if

2   you would have been straight with everyone in the past.  You

3   deserve at least what the judge gives you.  People just like

4   you ruin many peoples' lives.  What we don't need in this world

11:06   5   is people like you.

6          I feel sorry for the rest of your family, but not for

7   you.  Because of the way he is, I know my dad feels sorry for

8   you, but once again, I don't.  We all make mistakes in life,

9   but realize some make more than others.  I'd rather struggle

11:06   10   and pay bills with my freedom than to follow the footsteps of

11   someone like you.  You're not thinking straight.  How could you

12   possibly think you were never going to get caught?  You're

13   going to have plenty of time to think about what I've just

14   said.  There's -- there's no one to blame but yourself.  In

11:07   15   your mind, you thought you were smarter than everyone else, but

16   realized the most intelligent people just have good common

17   sense, which obviously you don't have.  Hopefully no matter

18   where you end up from here, you have a mirror to take a good

19   long look at yourself.  That's all I have to say.  Thank you.

11:07   20          THE COURT:  Any questions from anyone?

21          MR. WEIKUM:  No, Your Honor.

22          THE COURT:  All right.  Thank you.

23          MR. CHASE:  I just want to clarify, you're not a

24   family relation to the defendant, is that correct?

11:07   25          MR. MARK WANNER:  I am not.

7

1          MR. CHASE:  But you have the same last name.

2          MR. MARK WANNER:  Yes.

3          MR. CHASE:  Okay.

4          THE COURT:  Thank you, sir.  Thank you for being

11:07   5   here.

6          MR. MARK WANNER:  Thank you.

7          THE COURT:  When you get situated there, sir, if you

8   could just tell us your name and spell your name for the court

9   reporter, and then I'll turn it over to Mr. Chase, and I'll let

11:08  10   you say what you wish to say.

11         MR. LUNDQUIST:  Oscar Lundquist, L-u-n-d-q-u-i-s-t.

12  I guess I just wanted to speak today because, you know, we were

13  very shocked to hear all this come down.  We thought Kevin was

14  a pretty good friend of ours.  We'd always talk about this and

11:08  15  that and UND and NDSU and throw gibes back and forth, so my

16  wife and I were very upset when this kind of all come down.  We

17  were very hurt.

18         And, you know, when I retired, which was at age 62,

19  and I possibly would have worked until 65, but he had shown us

11:08  20  that, oh, you can make this much money retiring.  Why work?

21  And I think that was -- you know, basically he had his hands on

22  our money, I guess, so that kind of hurts when we look back on

23  that.

24         But other -- besides that, we had a representative

11:09  25  from Questar come in and look at this once it all had taken

8

place, and he was looking over our transactions, and he said,

"Oh, my gosh."  He said, "He's charging you commissions that

are way, way higher than they should be or I would charge."  He

said, "They're four and five times higher."  And we were -- we

were trading stocks like every 30 days, some of these stocks.

One we took -- I don't -- I was just looking back.  We took

like a $2,000 loss, and -- but he made good money on it, so at

least one of us won, I guess.

But besides retiring three years early, this cost us

money in additional health insurance costs, because at age 65

we would've paid a lot less for health insurance, so we got hit

there also.  But we lost thousands in the fact that I was

earning a good salary, and we gave up three years of salary.

And another thing that we were doing is I would take

part-time jobs in my retirement to try and cut back on how much

we were using on our -- you know, drawing from our retirement,

and only to find out he was taking it faster than I would ever

make any spare money working part-time work.

So all in all today, I guess the bottom line is it

just really hurt us because we thought we were friends with

Kevin.  And there again, like I say too, I feel sorry for the

family and sorry you had to go through this.  But, Kevin, you

got caught, and you're going to have to pay the piper, I guess.

I'm sorry about that, but it is what it is, so I guess that's

all I got to say.

9

1          THE COURT:  Any questions?

2          MR. CHASE:  I have none, Your Honor.

3          THE COURT:  Thank you, sir.  You may step down.

4          MR. LUNDQUIST:  Okay.

11:11   5          MR. CHASE:  I think that's it, Your Honor.

6          THE COURT:  All right.  And then were there five or

7   six witnesses that testified at the earlier hearing?

8          MR. CHASE:  Six.

9          THE COURT:  Okay.

11:11   10          MR. CHASE:  Including Mr. Mathias.

11          THE COURT:  Correct.  Mr. Weikum, if you have

12   witnesses, you may call them.

13          MR. WEIKUM:  We do.  The defense calls Lisa Voeller.

14                      LISA VOELLER,

15   having been first duly sworn, was examined and testified as

16   follows:

17          THE COURT:  You may proceed.

18                   DIRECT EXAMINATION

19   BY MR. WEIKUM:

11:12   20   Q.    Ms. Voeller, would you please state your name and

21   occupation, please?

22   A.    Lisa Voeller, L-i-s-a, V-o-e-l-l-e-r, and I am a licensed

23   addiction counselor in addition to an internationally certified

24   gambling counselor.

11:12   25   Q.    Can you go through a little bit of your educational

10

1    background related to the addiction counseling, please?

2    A.    Sure.  I earned my licensed addiction counseling degree

3    for alcohol and drug in 1987, did my training at the North

4    Dakota State Hospital.  Previously I had attended Minot State

11:12    5    University to specialize in that, and in -- and I've worked in

6    the alcohol and drug field, both inpatient and outpatient, both

7    with adults, vulnerable adolescents.  Worked with youth who

8    came from addicted families for a period of time.

9         And then I eventually did additional training through

11:13    10    Duluth Intervention Services for the -- to achieve the National

11    Gambling Certification in 1999, and then was -- had been hired

12    by Lutheran Social Services of North Dakota to conduct their

13    outpatient treatment program for problem gamblers and their

14    family members, and have been doing that up until the present.

11:13    15    Q.    Thank you.  Can you tell us what a gambling addiction is?

16    A.    Sure.  It's a very chronic disease, and it is a real

17    disease, and it's a progressive illness.  And it's

18    characterized by a significant loss of control in the

19    individual's life in every aspect, home, family, work, school,

11:13    20    financial, spiritually, emotionally, physically, mentally.  It

21    doesn't miss a beat.  And oftentimes there's a lot of disregard

22    for the negative financial consequences brought on by a

23    gambling addiction.

24         And in my work, what really separates a gambling

11:14    25    disorder from alcohol or drug use is we can see when somebody

11

1    is in trouble with alcohol and drugs.  We can get them the help

2    they need.  We can get them committed, whether they want to be

3    or not.  We don't see that with a gambling addiction.

4    Q.    Why -- why don't we see that with a gambling addiction?

5    A.    It's an invisible addiction, and gamblers get very good,

6    once they're addicted, at hiding the gambling, being in charge

7    of finances, because they're so desperate to gamble again.

8    It's very much like an alcohol or drug addiction where they

9    have significant urges, cravings.  It's that fix they need just

10   like an alcohol or drug addict does.

11         They need to be in action, or they need to be

12   escaping, and that's basically what Kevin was doing, was

13   escaping through his gambling addiction, escaping the stressors

14   of life, getting lost in that world.  And it affects your

15   thinking to the point where I'm glad he got caught too because

16   then he got treatment, and now he can get on with a new life.

17   He takes full responsibility for things, for his actions, for

18   how he's impacted people.

19         And addictions, no matter what addiction you're

20   working with, is out to destroy not only the individual that

21   suffers from it, but from the people, the family, the friends,

22   the co-workers that are in contact with that person.  It is

23   going to try to destroy a person's life, and it's very good at

24   doing that no matter what addiction you're working with.

25   Q.    How -- how prevalent is a gambling addiction, let's say in

12

1    North Dakota?  You have stats on that.

2    A.    Two to three percent of our population, some have

3    estimated as high as 4 percent nationally struggle with a

4    gambling addiction.

5    Q.    So what does that translate to in --

6    A.    One in 20 individuals end up with a gambling problem.

7    Q.    So 30,000 in North Dakota.

8    A.    Mm-hmm.  Yes.

9    Q.    All right.  Are there active gamblers doing exactly what

10   Kevin was doing right now --

11   A.    As we speak, yes.  Unfortunately, yes.

12   Q.    Do you treat those people?

13   A.    Absolutely.

14   Q.    Kind of walk us through what that treatment program is.

15   How do you make somebody like that understand it and fix it?

16   A.    Outpatient treatment.  We start with a gambling

17   evaluation.  Usually the people end up on our doorstep when

18   something as significant has happened as Kevin did, either

19   legal charges, or if -- usually the way family finds out is

20   through maybe something they received in the mail, they're

21   behind on their mortgage or a credit card statement that the

22   gambler didn't get to in time and it's revealed, and so then

23   the family confronts the gambler and is requesting of them to

24   get treatment.  Sometimes the gamblers do.  Sometimes they

25   don't.

13

1           But when they come into treatment, we start with a

2    gambling evaluation.  I utilize three screening instruments in

3    addition to the client's testimonial.  Those screening

4    instruments include a SOGS, which stands for the South Oaks

5    Gambling Screen, in addition to a Gamblers Anonymous 20

6    Questions.  And then the most significant of those is the

7    Diagnostic and Statistical Manual, the DSM-V, which is the

8    medical terminology for the disease that Kevin has.

9           And Kevin certainly met eight of the nine criteria,

10   so, obviously, when you're dealing with someone who already has

11   addiction problems, his was pretty far progressed before anyone

12   -- before he was caught or we realized what was going on, which

13   isn't unusual.

14   Q.    So tell us what somebody who is pretty far progressed in

15   this disease, what -- what are they doing on a daily basis?

16   A.    As far as when they're active in --

17   Q.    When they're actively gambling, yep.

18   A.    They're gambling daily pretty much at this point.  Even if

19   they're not gambling, they are so plagued -- the mental

20   preoccupation with this particular addiction is different,

21   again, than with alcohol and drugs, because a gambler can just

22   think about gambling, and it sets them up to immediately follow

23   up, where alcohol and drug, you got to go buy the alcohol, you

24   got to drink it before you can get drunk or shoot up.

25           For gambling, just thinking about it, that gets them

juiced up, and so they generally act on that because they can't quiet those cravings.  Even if they try, they really struggle with that, and so they will continue to gamble even though they may recognize -- I've had a lot of gamblers tell me, "I know I'm in trouble.  I don't know where to go for help, or I don't know what to do to stop this."  They think they're going crazy because it's -- they don't even understand.  How can I get addicted to something, a game I'm playing?  It used to be fun when I started, and it's miserable.

So when I hear comments like, you know, I'm having a good time or it was fun, that's not the case with somebody like Kevin.  He was miserable.  He had to do that because that's all he knew how to do anymore, and that was what was quieting those urges and cravings.  But he was very sick, and he didn't -- I don't believe any of my gamblers -- and Kevin, I know after working with him, did not intend to harm the people he did.

Q.   How -- how do you know that?  How do you come to that conclusion?

A.   In my experience in working with several gamblers over the years, people don't just set out to harm people unless they're a sociopath.  And it's not like Kevin was living high on the hog.  He did not -- he was not buying cars or houses or trying to improve his lifestyle.  If you look at the records, it all went to the bars that he was playing pull tabs in, and his intent was not to hurt people, but unfortunately --

15

1          MR. CHASE:  Your Honor, I'm just going to object to
2   what her foundation is for saying that -- that all of the money
3   went to --
4          THE WITNESS:  Based on my experience --
5          THE COURT:  Overruled.
6          THE WITNESS:  -- in working with gamblers.
7          THE COURT:  Overruled.  Go ahead.
8          THE WITNESS:  So basically there's a lot of remorse.
9   Gamblers do have to take responsibility when they come into
10  recovery.  That's a huge piece of the recovery process, is that
11  they own up to what they did, which Kevin has.  They have to be
12  willing to make amends, and sometimes that's not possible when
13  I have clients in legal trouble.  They want to, and they're
14  told they can't because of what's going on, until the case is
15  tried, but there's a lot of -- that's usually how I can tell,
16  by a client's response to this.

17         And when they're -- the mentality of a gambler is
18  when they get desperate and they're searching for money or that
19  drug or that alcohol, they will do anything.  I mean, he took
20  the money from his own family.  That's not going to stop him
21  from taking money from anybody at that point.  But it's not
22  like he's sitting down and thinking, you know, I'm going to
23  take from this person.

24         Yes, they shuffle money because they're desperate.
25  That's the drug for them.  They've got to have the money so

1    they can stay in action, and they get desperate, and they can

2    get creative and come up with ways to do that.

3            But their intent was not to harm anybody.  Their

4    intent was, as soon as I have that big win from those pull

11:21  5    tabs, I'm going to put that money back, and nobody is going to

6    know.  And once you do it once, it gets easier and easier, and

7    it becomes a lifestyle, and it overtakes their life and,

8    unfortunately, anybody that's impacted negatively as a result

9    of being in contact with him.

11:21  10   Q.   (MR. WEIKUM CONTINUING)  I'm going to follow up on

11   something that Mr. Chase talked about for -- or mentioned.  The

12   probation officer, when they did their PSI, determined that at

13   certain times -- and so did the State determine at certain

14   times Kevin was almost not working, legitimate income anymore.

11:22  15   Is that common with somebody who's got this type of gambling

16   addiction?

17   A.   Absolutely.

18   Q.   And you also talked about how he would hide it, it's a

19   hidden addiction.  It's something that he's not telling

11:22  20   anybody.  He didn't tell Deb, his wife, correct?

21   A.   Absolutely.

22   Q.   Okay.  And that's typical with this type of an addiction?

23   A.   Even more so with this addiction because it's so shameful.

24   They're so shame-based, and they're so embarrassed.  Again, how

11:22  25   do you get addicted to a machine, a pull tab, a card table?  It

17

1  happens.  Changes take place in the brain for those

2  individuals.  There's been enough research documented on that,

3  just like any other addiction.  It could be an increase in

4  adrenaline, causing a rush or excitement, the feelings.

5  It's not -- it's not -- I just want to convey, when

6  you're dealing with a gambling addiction, it is not about the

7  money.  The only thing the money serves is a drug for the

8  person to stay in action or to escape, to quiet those cravings.

9  It's about the feelings that these people are altering to

10  reduce stress, to reduce that shame.

11  They get caught up in a vicious cycle, and they can't

12  get out.  They don't know how to stop.  They probably know deep

13  down, I know I need to stop this.  They tell themselves, I'm

14  not going back, this is it, this is the last time I'm doing

15  this.  And they end up there again and again, sometimes an hour

16  later, sometimes the next morning, two days later, whatever,

17  but that vicious cycle does not quit until there is an

18  intervention and we can help them understand that they aren't

19  crazy, they do suffer from an addiction.

20  And have they done harmful things?  Absolutely.  They

21  didn't intend to do that, but it happened, and that's what

22  treatment is about, is making amends, making financial

23  restitution and taking responsibility for our behavior again,

24  but it's not about grief.  That's not why they're -- they're

25  stealing money.

18

1   Q.   And I'm going to follow up on that because there's a --

2   I've got a follow-up to my other question.  He didn't tell Deb

3   that he was spending all of this time gambling.

4   A.   Right.

11:24   5   Q.   And because of that, because he was spending all of his

6   time gambling, the PSI showed that he wasn't making any income,

7   so he replaced that income that would be noticeable to Deb with

8   monies that he was taking from his victims, from his clients.

9   A.   Yep.

11:24   10   Q.   From his mom and his dad and his friends.

11   A.   You borrow from Peter to pay Paul.

12   Q.   Is that typical with this type of an addiction?

13   A.   Absolutely.

14   Q.   Okay.

11:24   15   A.   Yep.

16   Q.   So I wanted to clarify with your statement, part of the

17   monies that he took went to replace the income that he would

18   normally make?

19   A.   Sure.

11:24   20   Q.   And is that typical?

21   A.   Very.

22   Q.   Let's talk about incarceration for a second and whether or

23   not that is a deterrent to somebody who's got a gambling

24   addiction.  Is it a deterrent?

11:24   25   A.   In my opinion and the experience I've worked with with

19

1    both gambling and alcohol or drug addiction, no.

2    Q.    Why not?

3    A.    I can sit around a group and run a group with addicted

4    gamblers, and they will tell you, it doesn't matter how many

5    stories we hear, it's not going to happen to us.  It's not

6    going to happen to me.  I'm going to put this money back as

7    soon as I win.  I'm smarter than another gambler.  You know,

8    they can hear those stories, and the craving and the way the

9    brain chemistry is, it just pulls them right back in.  It's

10   hard for -- I think we still struggle with fully understanding

11   these addictions and how they work.

12        But is it going to be a deterrent?  No, I don't -- it

13   hasn't been in my experience.  I think it's much more important

14   -- and I wouldn't be in this line of work if I didn't believe

15   treatment didn't work, and people do change, and they can go on

16   and live successful lives.  But do they have to be accountable

17   for what they did?  Yes, because I think that's a huge part of

18   recovery.  But I also think we have to get these people

19   rehabilitated and back living amongst society, giving back to

20   the community, supporting their family, supporting themselves,

21   paying back what they owe, helping others that are struggling

22   right now with this addiction, helping them understand and

23   trying to do some 12-step work.

24   Q.    I'll just ask you one more question then.  With the

25   contact that you've had with Kevin Wanner, where is he at in

20

1  his recovery and how is it going?

2  A.    Kevin has responded very well to the treatment process.

3  He was very consistent in attendance with meetings.  Generally

4  the only time he -- and he was very responsible and respectful

5  if he had to miss an appointment in contacting me.  That

6  doesn't happen with all my clients.

7         Gamblers are a population that are very

8  unaccountable.  They like to hide, sneak around.  That's the

9  lifestyle they're used to as a result of their illness, and so

10 when they get into treatment, that's a real huge piece I look

11 at, is how responsible are they becoming.  Are they changing?

12 And just even a phone call to me to say, "Hey, I can't keep my

13 appointment today because, you know, I'm ill," or "I had to

14 work and I need to reschedule with you."  When they're taking

15 charge like that, that says a lot, that they're invested in

16 their recovery.

17        He worked a 12-step program, and he's responded well

18 to that.  He -- I had -- he also did some additional

19 counseling, and I know his family was involved in that.  I did

20 have the opportunity to work with some of his family members,

21 and he takes full responsibility for what he has done.  He

22 feels a lot of remorse for that, so I know he's not just

23 somebody who is, you know, just doing it because he's very

24 narcissistic and sociopathic.

25        The true Kevin that you probably all have come to

21

1   know and loved and trusted is the individual -- just an example

2   I saw in treatment that I never really shared with Kevin, but

3   to me it was pretty remarkable, because when we look at

4   addictions, you know, we look at people as being liars.  They

11:28   5   lie.  They cheat.  They steal.  Of course, they do that.

6       But once the person starts transforming, hopefully

7   what we see is somebody who's no longer doing that, they're no

8   longer gambling, which Kevin did not have one slip during his

9   treatment that I'm aware of, and I believe that because he was

11:28   10   very consistent with attendance.

11       But even when they sold their home, Kevin's family

12   was -- I mean, for his spouse and kids, they were not

13   reimbursed either, and so they would've had an opportunity -- I

14   said to him, "Couldn't you back out of this sale then and just

11:28   15   stay there?"  And he said, "No, another family already bought

16   it, and I wasn't about to cause another family -- they sold

17   their home.  They bought ours.  It was already a done deal.  I

18   could have still backed out, but why would I do that?  I would

19   harm this family."

11:28   20       I don't even think Kevin realized it, but to me that

21   meant a lot.  That's the true person.  That's the person you

22   knew.  That's the person whose values are back in place and the

23   person that has that good character.  He's a good person.  He's

24   not a monster.  He did a bad thing as a result of his illness.

11:29   25   He's accepting responsibility for that.  That tells me he's

22

1    well on his road to recovery.

2            I think he's made a lot of significant changes.  I've

3    heard that with his wife.  I've heard that with his parents.

4    I've heard that through him as far as him saying how he thinks

11:29   5    he's changed.  He's more patient.  He's more loving.  He's more

6    available at this point, attentive to the needs of others and

7    his family, which is the person he couldn't be when he was in

8    the throes of his addiction for the last several years.

9            And he does care about people, and he does care about

11:29   10   how he's harmed others, and I have no doubts about that at all

11   in working with him the past two-and-a-half years.

12            MR. WEIKUM:  Thank you.  I have no further questions.

13            THE COURT:  Mr. Chase, any questions?

14                          CROSS-EXAMINATION

11:30   15   BY MR. CHASE:

16   Q.    I think most of your opinions today are based on your

17   interviews with Kevin, is that correct?

18   A.    Most of them.

19   Q.    Okay.  And is it fair to say, over that period of time

11:30   20   he's gained your confidence?

21   A.    Yes.

22   Q.    Okay.  And so everything that he is telling you, when he

23   says he cares and he's embarrassed, you take that as though

24   he's being honest with you.

11:30   25   A.    Yeah.

23

1    Q.    Okay.  Because, again, he's gained your confidence.

2    A.    Yes.

3    Q.    Now, you said, when I objected, that -- is it your

4    understanding that all of the money -- you said all of the

11:30    5    money he was using was going into the gambling.  That is based

6    -- did Kevin tell you that?

7    A.    Linked to that, based on what I had seen through the

8    media, presentence investigation, what I had access to, which

9    wasn't much.

11:31    10    Q.    Okay.  So did you get to see the Presentence Investigative

11    Report?

12    A.    No.

13    Q.    Did you see any victim statement in this case?

14    A.    Did I see any what?

11:31    15    Q.    Any of the victims' statements in this case?

16    A.    No.

17    Q.    Did you get -- did anybody fill you in on -- on several

18    victims that have already testified, how, like you, he gained

19    their confidence?

11:31    20    A.    Yes.

21    Q.    Did you hear any of that?

22    A.    Not -- from his parents I had heard that and from Kevin --

23    Q.    Okay.

24    A.    -- and Deb, family.

11:31    25    Q.    Now, I think -- I tried to write it down exactly, but I

24

1   didn't get it exactly.  You said something that it takes over

2   every aspect of your life.

3   A.     Yes.

4   Q.     And it doesn't miss a beat.

11:31   5   A.     Yes.

6   Q.     There's a lot of parts about Kevin's life that was -- that

7   has been reported great, actually, isn't that true?

8   A.     Reported as what?

9   Q.     Great, that he was a great dad, that he was a great

11:32   10   friend, that he was great at the church, that he was at all the

11   kids' events, at supper every night, he helped make breakfast

12   every morning.  He -- he was a great all-around guy, though he

13   might have gotten a little bit grumpier the last two years

14   before he was arrested.  I mean, is -- does that sound like

11:32   15   every aspect of his life was -- was being ruined by this

16   disorder?

17   A.     Yes, because Kevin carried the burden of the secret for

18   the last 15 years, and that -- that is very stressful for the

19   person.  They can cover it up very well and act like everything

11:32   20   is okay in their lives.

21   Q.     So even though every aspect of his life wasn't affected by

22   this, he was affected because he was stressed that he was doing

23   this.

24   A.     That he has this disease and the behavior he's engaging

11:32   25   in.

25

1  Q.    Now, you said that gambling for people like Kevin help

2  them escape from the stressors, so is -- it's fair -- is it

3  fair to say that the guilt that he had from stealing from

4  people, that he would kind of take care of that guilt somewhat

5  with gambling?

6  A.    Sure.

7  Q.    The thrill of maybe winning, or something, would -- would

8  distract him from having met with somebody and stolen their

9  money.

10  A.    Yes, you can completely forget about that when you're in

11  -- when you're actually gambling.

12  Q.    So in a lot of ways the gambling disorder helped him cope

13  with -- with whatever guilt he had over a 15-year period from

14  stealing from people.

15  A.    Yes.

16  Q.    And you said that somebody -- at one point you said he

17  didn't intend to harm anybody.  Again, is that based on what

18  he's told you?

19  A.    Yes, and my experience in just working with this

20  population in general.  And I guess I look at it as, unless I'm

21  working with a sociopath that I have, most people who suffer

22  from this disorder do not set out to intentionally harm people.

23  It happens because of the illness.

24  Q.    One thing that you said, that -- that you felt that he

25  hasn't gambled, and he is -- he has -- is because he's been

11:33

11:33

11:33

11:34

11:34

26

1  consistent with attendance.

2  A.    Yes.

3  Q.    But you know that he is -- attendance is something that he

4  always did really well.

11:34  5  A.    Yes.

6  Q.    He was always kind of -- he was always where he was

7  supposed to be, is that --

8  A.    Yes.

9  Q.    And you still think that was a big deal, that he was at

11:34  10  your meetings even though that --

11  A.    I do.

12  Q.    -- he was attending everything else when he was stealing

13  everybody else blind?

14  A.    I do, because my gamblers, there's a high dropout rate

11:35  15  with them, and he could have easily dropped out, come up with

16  more excuses to not show up.

17       I'm also basing that on, I've met with his wife.

18  I've met with his parents.  His wife, you know, they've -- they

19  were all involved to learn more about what they're dealing with

11:35  20  and what Kevin is dealing with with this disorder at a -- at a

21  conference that they had attended over a year ago and the

22  importance of, you know, look -- what signs to look for if

23  someone would relapse, what to do if that happens.

24  Financially, have your eye on that money.

11:35  25  Q.    And you said some people drop out from their treatment.

27

1    A.    Yes.

2    Q.    Of the people who dropped out, were any of them facing a

3    sentencing where they were looking at 20 years?

4    A.    I've had clients -- yes.

11:35    5    Q.    Often?

6    A.    Probably not 20 years, but I've had clients that have

7    returned from serving time.  It's been court-ordered that they

8    attend treatment, and they have still dropped out.

9    Q.    Isn't it more likely, though, that people drop out when

11:36    10    they're not -- when they don't have an impending sentencing

11    coming down the road scheduled?

12    A.    On occasion.  I think it really depends on the individual,

13    though.

14    Q.    Of course, right?

11:36    15    A.    I do.

16    Q.    That's the answer to every question in the world.  It

17    depends on the person, right?

18    A.    Right.

19    Q.    So to answer my question, isn't it more likely that

11:36    20    somebody who is facing a sentencing would -- would continue

21    their treatment for no other reason, to con the judge, to con

22    you, to con all of us?

23    A.    Sure.

24    Q.    Of course, right?

11:36    25    A.    Yep.  Yep.

28

1   Q.   Now, you also -- you were also moved by the fact that --

2   that Kevin said he didn't want to stay in his home when -- when

3   they sold the house?

4   A.   Yes.

5   Q.   Did you know or did he tell you that the house was subject

6   to a federal forfeiture?

7   A.   Yes.

8   Q.   Okay.  Did he explain to you that it may not be his choice

9   to stay in the house?

10  A.   Yes.

11  Q.   So despite the fact that he told you it wasn't his choice

12  to stay in the house, the fact that he said he wasn't, that

13  moved you to feel like he's reformed?

14  A.   Yeah, I think that is a big deal.  He obviously knew what

15  could happen, but he still wasn't going to put somebody else

16  out.

17  Q.   But even though he may not have had the power to do that,

18  right, even if he wanted to?

19  A.   I'm not exactly sure I'm understanding.

20  Q.   Well, legally I'm saying he may not have been able to do

21  what he -- what impressed you so much that he wasn't doing.

22  A.   Because they would have been --

23  Q.   He couldn't have done it anyway.

24  A.   True.  Yeah.

25  Q.   And that still moved you.

11:36
11:36
11:37
11:37
11:37

29

1   A.    It did.

2          MR. CHASE:  I have no further questions, Your Honor.

3          THE COURT:  Anything else?

4          MR. WEIKUM:  Just something for clarification.

5                    <u>REDIRECT EXAMINATION</u>

6   <u>BY MR. WEIKUM:</u>

7   Q.    Let's talk about the house a little bit, Ms. Voeller.

8   Were you aware that the government wasn't taking the house

9   unless he decided to sell it?  Did he tell you that?

11:38   10   A.    Yes.

11   Q.    Okay.  So he could have chosen not to sell the house,

12   correct?

13   A.    My understanding was they mainly sold it because once

14   Kevin was free of his gambling and was starting to think

11:38   15   rationally again, he also knew that his family -- he had to

16   look out for them as well, and he knew he could not -- it would

17   not be cost-effective for them to stay there.  They had to

18   downsize.  Even the upkeep for his wife would have been too

19   much.

11:38   20          His kids are at an age where they're going on to --

21   you know, with their own lives.  They're not going to be there

22   to help out.  He needed to do something to make the time easier

23   for his wife during his absence, and his children, so --

24   Q.    And the -- your understanding was the timing of that

11:39   25   transition was something that was up to Kevin and Deb, and they

1   were trying to decide.

2   A.   At that time, yeah.

3   Q.   And what moved you, if I'm correct, was that his decision

4   with the timing took into consideration harming another family

11:39   5   that he didn't know.

6   A.   Absolutely.

7          MR. WEIKUM:  Okay.  Nothing further.

8          THE COURT:  Anything else?

9          MR. CHASE:  No, Your Honor.

11:39   10          THE COURT:  All right.  Thank you.  You may step

11   down.

12          You have another witness?

13          MR. WEIKUM:  It's actually a victim who wished to

14   testify as well, and so I could just call them up the same way

11:39   15   that Mr. Chase did, if that's okay with --

16          THE COURT:  That's fine.

17          MR. BOOKE:  First off, my name is Mike Booke,

18   B-o-o-k-e.  I'm Kevin's brother-in-law.  I've known him since

19   he was nine or ten years old.

11:40   20          The transformation of Kevin since this has happened

21   is something else.  I was where you guys were two-and-a-half

22   years ago, when I got the call, because I also had money

23   invested, and you think, how can somebody do this to me?  He's

24   some kind of monster.  That's not the case.

11:40   25          What happened is we were blind, the whole family

1    here, to see Kevin's little addiction problem that turned into

2    a huge problem, because I remember it.  He come up to the lake.

3    He pulled pull tabs.  We'd throw in a few bucks.  Well, he

4    couldn't quit.  It's no different -- I have a -- I have a

11:40    5    deceased brother that was alcoholic.  Guess what took him out?

6    When you have these addictions, you just can't -- you can't

7    quit, and that's what happened.

8         If you look over there to your left and look at those

9    four people sitting right there, that's what Kevin Wanner is

11:41    10    about, not this right here.

11        And I tell you what, Mr. Wanner, I've seen the anger

12    in your eyes.  I had the anger myself.  As time goes on, I

13    think you'll see that this is probably going to make him a

14    better person than what you're seeing here today or what you

11:41    15    seen two years ago.

16        I believe that putting him away for years is not the

17    answer.  Some of us have gotten our money back; some haven't.

18    He needs to make restitution.  He needs to get back into the

19    game.  And, no, he's never going to be an investment counselor

11:41    20    again.  As a matter of fact, he's worked at Menards for a

21    couple years to support his family.  What we need to do is get

22    people like him back into the groove of reality, away from this

23    addiction that he had, that he was so good at covering up, his

24    dad, his mother, his wife and children did not know.  We didn't

11:42    25    even know.

32

1          It's such a crazy thing that in this society, we have
2     this treatment for the drug people.  We have this treatment for
3     the alcoholics.  But you know what, these guys that get hooked
4     up on gambling, they're kind of pushed into the corner and
5     they're kind of -- until they meet somebody like Lisa, they're
6     kind of on their own on this deal.

7          And I know you guys are thinking, yeah, right, he
8     spent all that money on that.  What happened was he was using
9     your money, my money, our money to sustain his life because he
10    was spending all this money gambling and all this time
11    gambling, that he wasn't working anymore.

12         I tell you what, putting a gentleman like this away,
13    which I believe has gotten nothing but a better person the last
14    two years because of this -- if you don't think he's -- he's
15    got remorse, you have not seen what we've seen out of this
16    gentleman the last two years, lots of remorse, lots of tears,
17    lots of -- believe me, he's contemplated suicide.  We begged
18    him not to.

19         We did it.  Here he is to face the piper, like you
20    guys all say.  Right, he has done wrong, but does a person like
21    that end up in prison?  Does that do any good for any of us,
22    especially society, so we can pay five, six hundred dollars a
23    day for him to -- he needs to get back in the workforce.  He
24    needs to get back onto his life, take care of his wife and
25    kids, like men are supposed to.  Thank you.

33

1    THE COURT:  Thank you.  Any other witnesses?

2    MR. WEIKUM:  Kevin Wanner would like to talk whenever

3    it's appropriate.

4    THE COURT:  Well, I'll give an opportunity to after

5    the attorneys have --

6    MR. WEIKUM:  Thank you.

7    THE COURT:  -- spoke.  I will now give both sides an

8    opportunity to outline their recommendations for a sentence, as

9    well as any conditions of supervised release.  When the

10   attorneys are done, Mr. Wanner, I'll give you a chance to

11   speak, as I'm required to do under the law, but we'll start

12   with the government's recommendation from Assistant U.S.

13   Attorney Nick Chase.

14   MR. CHASE:  Your Honor, my recommendation for the

15   sentence of imprisonment is 135 months.  This is a case that,

16   as we all know by now, most of the restitution was paid for by

17   somebody else.  Those two entities that have paid the

18   restitution to the direct victims in this case will be

19   substituted as victims, restitution victims.

20   But let's be honest.  I happen to run a FLU unit in

21   our office, and we collect --

22   THE COURT:  "FLU" means what?

23   MR. CHASE:  I'm sorry, Financial Litigation Unit,

24   where we collect restitution from people.  We have millions and

25   millions outstanding in restitution, and we get it back 25, 50

34

1   dollars at a time.  This defendant is going to be on some

2   payment plan where he pays a hundred bucks a month or 200 bucks

3   a month or 300 bucks a month, and he's never going to get close

4   to the millions that he's going to owe.

11:45    5       This is not a -- this is a case where the forfeiture,

6   which, you know, is the money judgment for the amount that he

7   -- proceeds, it will never be collected.  It's -- it is --

8   it'll be a tool maybe of going after an asset in the future, or

9   something, but it's not going to be anything that will be

11:45    10   collected.

11       This case, this -- the judgment in this case is --

12   all comes down to the sentence of imprisonment, and when you

13   look at the factors and looking through this defendant's -- of

14   where he should be, I think he checks all the boxes for a

11:46    15   sentence of at least 135 months, the low end of the guideline.

16       I think when you heard the -- you know, if I hear or

17   read the words that he takes full responsibility again, I

18   just -- what passes for full responsibility these days is

19   beyond me.  Taking full responsibility is what now?  Blaming it

11:46    20   all -- the devil made him do it, that he has this addiction

21   that he can't control and -- but I take full responsibility.

22   Take full responsibility, but it's not me, it's a sickness,

23   like a cold.

24       This Court every week sees people with very serious

11:47    25   addiction issues, and it's rare that we sentence somebody in

35

federal court that I don't see where they have -- they don't

have something going on, and they don't have nearly the

education or the support network that this defendant has.  This

defendant has done something extraordinarily bad both in

11:47   magnitude and when you look at in -- on an individual basis.

In this case every person we put on the stand gave

tear-jerking testimony.  These people are the salt of the

earth.  They -- they are -- they are living the American dream

in the way that they have always been preached to live it.  You

11:47   live within your means.  You save.  You don't live

extravagantly.  They all did it.

And person after person, it didn't mean that -- it

didn't matter if they were saving for a granddaughter who was

having life-threatening surgeries.  Kevin was looking right at

11:48   them and saying, "Well, that sounds terrible.  Now give me the

check."  I don't know who does that.  That's not a gambling

addiction.  That is somebody who is willing -- who is a

predator, who is able to say your money is my money.  I deserve

your money.  You don't deserve your money.

11:48   I don't -- when you look at the Wayne Hamiltons of

the world, who had -- if you remember, Your Honor, had some

money legitimately invested, and then had given some in -- in

Mr. Wanner's Ponzi scheme.  When Wayne's wife died, he needed

money for the funeral, and he needed money back that he had

11:48   given to Mr. Wanner.  Mr. Wanner ended up taking that out of

36

1   the legitimate ones and selling the legitimate investments that

2   he had had to get him the money.  Even at that point, the man's

3   wife had just died, and he -- didn't dawn on him, oh, maybe I

4   should give the money I stole from him back.  No, he cashed out

11:49   5   the stuff that was legitimate that could have been making more

6   money.

7        Again, I -- I know you've read everything in here.  I

8   don't think any of these victims in this case have heard much

9   remorse at all, including his own family members, which is

11:49   10   evidenced in some of the victim statements.  Even his own

11   family members say, "I haven't seen any remorse from him," and

12   that's dated April 2008 (sic).  None of these victims have seen

13   any remorse, none.

14        What's stopping him?  In his letter he says, "Oh,

11:49   15   gosh, I've just been stopped from -- from showing all this

16   remorse in my heart."  What was stopping him?  What?  He was

17   charged back in 2015.  Here we are in 2018.  This -- I mean,

18   this -- what has been stopping him from showing all that

19   remorse that he claims to have?

20        This case, as evidenced by the letter from the

11:49   21   Securities Commission, is as bad as it gets.  It's as bad as a

22   fraud case as -- as we've had.

23        There was a defendant several years ago by the name

24   of Medhus, who stole about a million, and he got 10 years in

11:50   25   state court in Cass County.  He's up on 5 years, and I know

he's asking for parole, and that's being opposed by several
entities, but he's put 5 years in for stealing a million.

You know, I just -- I don't think -- I've sentenced
people to three and four years who stole a couple hundred
thousand dollars from banks or from -- or stealing identities,
and -- and the banks ended up picking up all of the -- the
harm.

This case, the sentence itself of imprisonment of
135 months would -- would show that this was very significant
both in the micro and the macro.  You can't turn over a single
stone in this case and not find somebody who has been
emotionally bludgeoned by Kevin Wanner in this case.

And but for the -- the complete bolt of lightning
that happened in this case and the -- and the recovery from
those two companies, again, having nothing to do with what
Mr. Wanner did, they would have been financially devastated as
well, and for a year-and-a-half they believed they were
financially devastated.

And I'm sorry.  I assume Ms. Voeller is a -- is very
good at what she does, but she's basing her opinions on
somebody who is able to con some very intelligent people, which
this Court has heard from.

And you know what, there was a lot of spending on
vacations here, on Twins tickets.  I'm sorry this man could not
afford going to the Twins games.  His family couldn't afford

38

going to private school.  They couldn't afford buying the cars
that they have.  They couldn't afford redoing their house.
They couldn't afford all these vacations and this -- and the
spending they did.  None of it they could afford.  They lived
way beyond their means.

Based on some of the statements that -- that are in
support of Mr. Wanner is exactly, I believe, what happens in
all this -- these cases.  You want more money.  You spend more
than you have.  You start taking a little bit.  You start
taking a little bit more of it.

You're trying to keep up with the Joneses.  You like
to show up to the games with your suit on.  You like to project
the fact that you're an outstanding member of the community.
Then you start feeling kind of guilty about that from time to
time.  In your quiet moments you start gambling, and you start
-- and you start trying to make yourself feel better about it.

In this case the gambling is -- is -- it's an issue.
He clearly has a problem, but I -- again, in looking at all of
the cases that have come to this Court with just in some cases
generations of addiction issues, those people get sentenced to
lengthy sentences.  They don't get a pass.  They don't get
their hands slapped because they have this illness to blame
everything on.

I think the type of harm that's been caused in this
case, the significance of the case, the fact that this

39

1    defendant is never going to even scratch the surface of the --

2    of the amount that he is owed -- and he can say that he's

3    taking full responsibility until the cows come home, and I

4    haven't seen it.

11:53    5        I'm sorry, taking one job is not -- is not

6    extraordinary.  Taking two jobs, taking three jobs -- there's

7    people out there who work three or four jobs.  Where's that?

8    That would impress me.  Oh, great, you go out and you get a

9    job.  Well, good for you.  You know you -- you know you have

11:53    10    this sentencing come up.  You -- you make all of your

11    appointments with your counselor.  Well, good for you.

12        And you know what, I'm -- if he has a problem and if

13    this is making him a better person, fine.  We're not here to

14    decide whether or not he's a good or bad person.  We're here to

11:54    15    talk about what he did, and what he did was bad in so many

16    ways.  It deserves a lengthy sentence.

17        And, Your Honor, again, our recommendation, based on

18    the -- on the harm caused, the fact that -- as I've said in my

19    sentencing brief, the deterrence, not so much to Mr. Wanner but

11:54    20    to all of the other financial and other people who hold

21    fiduciary responsibilities with people out there who are

22    meeting with all of our friends, relatives, and those people

23    are trusting them.

24        And -- and I guess there's 2 to 3 percent of them out

11:54    25    there who have this addiction.  Well, there's probably others

40

1    that have other problems too, and the message needs to be sent

2    is you don't get to just do this, somebody else pays back all

3    the money, and you just have to go to jail for just a little

4    while.  The message there is that, boy, that wasn't all that

11:55    5    bad.  That -- that seems like something that -- that wouldn't

6    deter me at all.

7         So, Your Honor, based on all the factors, on the

8    sentencing guidelines, and the (a) factors I think supports a

9    sentence of 135 months.

11:55    10         Again, I think I would ask the Court -- I think

11   there's some restitution issues.  If the Court would give us

12   some direction on what you think, how it should be calculated,

13   I think Mr. Weikum and I could probably at least agree or

14   largely agree on all of that, and we could put that -- the

11:55    15   restitution in a -- in a stipulation, and then the forfeiture

16   order as I mentioned earlier.

17         THE COURT:  Thank you.  And who else is seated with

18   you, Mr. Chase?

19         MR. CHASE:  You've met Mr. Mathias at the past one.

11:56    20         THE COURT:  Kelly Mathias?

21         MR. CHASE:  Yes.  And next to me is Kristin

22   Baumgartner from the Internal Revenue Service.

23         THE COURT:  All right.  Mr. Weikum.

24         MR. WEIKUM:  Thank you, Your Honor.  I'm going to

11:56    25   bounce around a little bit, and I apologize if I -- if I jump

41

1   back and forth.  Some of my stuff is going to be responsive to

2   what Mr. Chase talked about.

3        I'll start with Mr. Wanner not showing remorse, and

4   he said, "Who keeps him from doing that?"  Mr. Chase -- Mr.

11:56   5   Chase said that.  Sadly, Your Honor, it's me.  I keep him from

6   doing that -- it's my job -- and Mr. Chase, as the government

7   keeps him from doing that.  As soon as those communications

8   start happening, we all know how -- what happens.  We end up in

9   a situation where we've got witness tampering.

11:56   10       There is nothing more that Mr. Wanner has wanted to

11   do since the first day he walked into my office in tears and

12   say, "I need to go talk to these people."  He's going to get to

13   do that today.  This day is a horrible day for him.  This day

14   is a great day for him because he gets to turn around when I'm

11:57   15   done and he gets to talk to them.  He gets to talk to them and

16   explain to them why he did what he did.  And so, sadly, as it

17   is, the answer to Mr. Chase's question, it's Mr. Chase and I.

18       Either we believe addiction and we understand its

19   pathology or we don't.  And I know that everybody that works in

11:57   20   this court system, and that includes Mr. Chase and myself, and

21   that includes Kelly Mathias and myself, understand that

22   addiction is massive in our country.

23       It's so massive that right now the opiate addiction

24   is everywhere.  In fact, Mr. Chase's predecessor, a friend of

11:57   25   mine, Tim Purdon, is actually bringing class-action cases suing

42

who?  The manufacturers of opiates, saying, you know what,
people cannot control these addictions.  We can't.  Everyone
has them.  It may be little.  It may be you like Starbucks
coffee.  It may be we like chocolate, but when you need it, you
need it.

And sad as it is to have a situation like this, you
look at a situation with Mr. Wanner, somebody who, if you would
take a look at the rest of his life from beginning to today, he
never shows up on any of our radar.  He doesn't brush the court
system.  He's not getting pulled over for speeding tickets.
He's not DUI.  I can't think of clients who walk in to me, and
I asked them what their criminal record is, and they say zero.

Ms. Voeller talked about how prevalent it is in our
society, particularly in North Dakota, for us to have problems
with gambling.  What makes it even worse is we hide it, and
that's what happened here, and it is either textbook gambling
or his pathology is a sociopath.  And here's the kicker, none
of that fits.  A sociopath doesn't fit at all with any of the
other items that are going on in his life, zero.  There's no
evidence before this Court that he is a sociopath.

There is evidence before this Court that he has got a
massive gambling addiction.  And you know who we can use as a
really good indicator of that is all these people, everybody.
Every single one of them saw the Kevin that was the great dad,
the Kevin that did what he was supposed to do as a father, as a

43

husband, somebody who went to mass, somebody who was engaged in the -- in the education with their kids, somebody whose wife teaches school at the kids' education, and I'll touch that for one second.

By the way, there was -- most of their college education -- or their education was paid for as a stipend that she got through her teaching.  She teaches at the Catholic school that these kids went to, and so there's a little bit of -- and again, I didn't expect Mr. Chase to know that, so I'm not saying he was misleading the Court, but that's where that was coming from.

It is our responsibility to understand that what we put into play in this situation is that people like Kevin are going to have addiction issues, and we're going to either throw them in jail and -- and throw away the key, 10 years, 11-and-a-quarter years, as 135 is, or we're going to say, you know what, that's not what we need to do as a society.  This situation is fixable.

And the other thing is, as the Court knows and Mr. Chase knows and Kelly and -- Mr. Mathias knows -- I apologize for using your first name.  In my other side of what I do for a living -- the majority of what I do for a living is I go after brokerage companies who don't watch their employees.

The reason that these two brokerage companies ponied up -- and it's not easy to get them to, and I commend Kelly,

44

Mr. Mathias, for doing that.  It's not easy to.  They were not
doing what they needed to do from a supervisory standpoint.  It
doesn't absolve Kevin, but what it does say is, "Listen, there
is a reason why we're all here."  This would have been caught
15 years earlier had they been doing their books, had the
brokerage companies did, and that's why the civil actions,
which those people in the back row had, were settled so quickly
in legal terms with those two brokerage companies.  They were
screwing up, and they were screwing up big.  Mr. Mathias
pointed it out to them, and they wrote the checks.

It's a little different than a normal situation.  I
bring class-action cases.  I represent people like this every
single day against brokerage companies, and this case was a bad
case from the brokerage company.  They should have caught it.
They had a responsibility to everybody out there.

We, as a society, have a responsibility to say, "How
do we fix this?"  Fortunately, we're not dealing with a
situation where Mr. Wanner has an alcohol addiction that caused
him to get in a car and to kill somebody.  That's not the
situation.  That's unfixable.  We can't fix it.  This we can
fix.

The sentence in this situation does send a message,
and it sends a message which echoes what everybody saw,
everybody who is sitting across the dinner tables from
Mr. Wanner and listening to him when he was -- when he was

45

their broker, when he was talking to them, they met the real
Kevin.  There's an underlying addiction pathology that's there,
and we know it's there, and as much as the government wants us
not to look at it, folks, we know it's there.

12:02

And Mr. Chase is right.  Our prisons are full of
those people in situations that can't be fixed.  This one can
be fixed, and it has in large part simply because of the way
that Mr. Wanner and the way that the brokerage companies set it
up.

12:03

Interestingly enough, the people who have yet to be
paid are some of his family members.  The brokerage companies
are waiting to see what happens here before they're going to
write the checks and make sure that the rest of those items are
paid, so those are things that are going to happen yet, and
12:03
that's why that 200-and-some thousand is still in limbo.

This is a tough case, and it's a tragic case for
everybody involved, and that's what -- one of the things that I
stand shoulder to shoulder with Mr. Chase on.  It's horrible.
In that sentencing -- in the hearing that we had before,
12:03
listening to the pain and the anguish that those people went
through, absolutely, absolutely horrible, and it is explained
again when you compare the two.  It's either sociopath or it's
addiction.

THE COURT:  Or a combination of both.
12:03
MR. WEIKUM:  Or it can be a combination of both, but

46

1   again, it's important for the Court to understand, the

2   government had the ability, if they wanted to, to test and see

3   whether or not there was any sociopathic behavior on the part

4   of Mr. Wanner.  In fact, it's required by the PSI.  When they

5   -- when they do it, part of the pathology they're looking at is

6   to see whether or not there's any underlying things, and I know

7   that because this Court has sent some of my clients off to have

8   a psychological analysis done for them.  It didn't get done

9   here.  It can't be done here, and it can't be considered.  And

10  I understand that the -- that the government wants it to go

11  that direction, but it can't.  It's not there.

12          And in part it's about mercy as well, and if you're

13  looking at somebody with addiction -- this is driven completely

14  by addiction.  That's the evidence.  There's no other evidence

15  that can be accepted by the Court from a pathology standpoint

16  other than the addiction.

17          THE COURT:  That's nearly every defendant that I see

18  every day of the week.

19          MR. WEIKUM:  It is to the -- to the extent as to what

20  is driving the addiction, and again, you're looking at what the

21  crime is based on that.  But you don't have that situation in

22  somebody with a gambling addiction and a financial advisor.

23  That combines them and it makes it different.

24          The -- in trying to search -- and I too have

25  represented people from the other side, and there was a

gentleman in Minot -- and I apologize for the Court.  It was in state court, and I forgot the name, but he was represented by Mr. Boeckel and myself, and he -- he had been involved in a $1.9 million scheme, and his -- and in which they didn't get the money back.  He got two years for his time.  And as I was looking, I was trying to figure out, okay, if somebody gets the money back, there's a good -- there's a good indicator as to where it is.

Right now there's a $250,000 amount that's roughly outstanding yet.  That money is going to be coming back, so it's possible at the end of this that the net loss is going to be fairly small, with the exception of brokerage companies, and for that we're going to request that the term of imprisonment be 24 months.

If the Court has any questions, I'd definitely be willing to respond.  And as I had indicated before, Mr. Wanner would like to talk.

THE COURT:  All right.  I will give Mr. Wanner the same opportunity as the attorneys then to say anything that you wish to say about this case, sir.  There's no restrictions on what a defendant can say at a sentencing hearing, so if there's anything you'd like to say or any questions that you have, you're free to speak at this time as well.

THE DEFENDANT:  There's not a minute that's gone by that --

48

1          THE COURT:  We're going to have to have the

2     microphone so the court reporter can hear him.

3          MR. WEIKUM:  Would it be better if he took the stand

4     or -- from that standpoint?

12:07   5          THE COURT:  Stand or sit, or whatever, but we have to

6     have a microphone so that the statement can be taken down.

7          THE DEFENDANT:  There hasn't been a minute that's

8     gone by that I haven't thought about what I've done, and I

9     can't imagine what I put you guys through.  It's something I

12:07   10    take -- it's my fault, and if I could have came up to you right

11    away and apologized, said I'm sorry, I would.  And I always

12    wanted the opportunity to come up and say I'm sorry to Joan and

13    Irene and Oscar and Wayne and Mark and Collin and Lisa and

14    Leone and Bob, all of you.

12:08   15          I know I did wrong, and I'm so sorry.  I don't

16    know -- I felt like a coward because I couldn't come up and say

17    I'm sorry.  You know, it -- it hurt, and I just -- I pray for

18    you that some day I can talk to you more and that you will

19    forgive me and that we can go on.  And I'll do anything in my

12:08   20    powers to help you get through.  I'll do anything.  It's just

21    tough to live and tough to -- like I say, I can't imagine how

22    much I put you through.

23          To my family, I failed.  I failed you.  I failed you

24    as a husband, as a dad, a son, as a brother, an uncle and a

12:09   25    brother-in-law and a friend.  I don't know.  I hope I have some

49

1   time where I can show you who I am -- really am and you can

2   trust -- trust me sometime, and I can show some good things,

3   and not just by words, but by actions.  And I'm just sorry.  I

4   want to be able to show you who I am.  And that's all I have to

12:09   5   say.

6           THE COURT:  All right.  Thank you.  Is there anything

7   more that either attorney wishes to say?

8           MR. CHASE:  No, Your Honor.

9           MR. WEIKUM:  No, Your Honor.

12:09   10          THE COURT:  All right.  Well, I have reviewed the

11  Presentence Investigation Report a couple of times, along with

12  all of the other pleadings that I'd previously identified,

13  including the letters of support, letters from victims,

14  testimony presented by victims at a prior hearing and this

12:10   15  hearing, and all of that information I've given careful

16  consideration to.

17          And all of that addresses not only the sentencing

18  guidelines, but sentencing factors under 18 USC, Section

19  3553(a).  That's a statutory provision under federal law that

12:10   20  I'm also required to consider before I sentence any defendant.

21          And I've sentenced thousands of defendants.  I've

22  gone back and looked at prior sentencings that I've ordered in

23  cases involving embezzlement and money laundering and mail

24  fraud such as this.  I've sentenced dozens and dozens of

12:10   25  defendants involving similar crimes.  The sentences have ranged

anywhere from a couple of years to 17 or 18 years for some

gentleman down in Phoenix that embezzled 15-plus million

dollars.  And most of my sentences -- in fact, I think

virtually all of my sentences have been in conformance with the

sentencing guidelines and the 3553(a) factors.

The statistics nationwide reveal that the majority of

the time when defendants are sentenced in federal court, they

receive a sentence that falls within the advisory sentencing

guidelines.  The fact is the statistics reveal that about

80 percent of the time defendants are going to receive a

sentencing guideline sentence, or if they've cooperated with

the federal government in connection with some other criminal

misdeeds, they receive a sentence that's been recommended by

the federal government.

I don't take these cases lightly.  I -- I'm cognizant

of my prior sentences in these cases.  And I review the

statistics generated by the Administrative Office of the U.S.

Courts that come out every three months that reveal what every

judge does in terms of sentencing and what the sentence ranges

are in cases of this nature.

This was a rather calculated, sophisticated scheme to

defraud clients, many of whom were elderly, and it went on for

more than -- or approximately 15 years.  It took a lot of

planning and thought.  It involved such things as creating

fictitious 1099s and fictitious CDs and bank statements and

financial records that reflect the earnings and investments of
people.

And the total loss was somewhere in the range of
$5 million, correct?  But there were about $2 million that were
repaid to victims over the course of many years.  And,
fortunately, there were some insurance settlements that
resulted in more monies being paid back to the victims, but
there's still a loss in this case of in excess of $3 million.

There's going to be a judgment against you,
Mr. Wanner.  You're going to have to pay back victims or
insurance companies.  They've got a subrogated interest.
They're going to step into the shoes of the victims that they
paid monies back, and I know that those monies are never going
to be paid back in their entirety.  It's just not feasible.

And I also understand a little bit about addiction.
Nearly every defendant that I see in federal court is suffering
from some form of addiction, whether it's alcohol, street
drugs, sex addiction, gambling addiction.  I rarely see
defendants that don't have any mental health problems or
addiction issues.  If all I had to deal with was people that
didn't have addiction issues, I'd have a lot of free time on my
hands.

And the prisons -- the federal prisons and the state
prisons are full of persons who have addictive personalities.
Right or wrong, just or unjust, there needs to be consequences

52

for those that have addiction problems that commit federal
crimes.

In this case, Congress and the Sentencing Commission
have adopted the sentencing guidelines that are designed to
provide some consistency in how defendants are sentenced around
the country that commit these types of crimes.  The sentencing
guidelines have been around since 1987.  In these white-collar
type of crimes, the Sentencing Commission has determined that
there's rather serious consequences even for those defendants
that have addiction issues.  And the fact that any defendant
has serious addiction issues doesn't usually equate with
leniency in the federal system.

Right or wrong, just or unjust, there have to be some
consequences for the misconduct that occurred in this case.  I
don't think that two years for bilking 39-plus victims out of
$5 million is a just result.  I think that anybody that sits on
the other side of the fence and was a victim or have had
parents that were victims wouldn't feel that that's a just
sentence, and it really depends on what side of the fence
you're sitting on in this case.

I read every letter of support from family members,
Mr. Wanner's wife and kids, close relatives.  I read all of
those letters twice, and they're extremely sad because it's
always the family members that get left holding the bag at the
end of the day.  They're the ones that suffer the most serious

53

consequences, and most of the time they didn't have a clue what
was going on.

　　　　But it's also the victims in this case for which this
whole scenario is extremely sad, people that worked their --
worked their whole lives to save money to be able to retire and
spend it on what they wanted to spend it on, to be bilked out
of those hard-earned monies, some of which have been repaid,
but they'll never total -- be total compensation.

　　　　And I listened carefully to the testimony of Ms.
Voeller.  I think she's -- seems like a very competent,
professional person who knows her trade well, and I think does
her clients a great service, but even gambling addicts don't --
it doesn't necessarily equate with some leniency in sentencing.

　　　　In addition to the sentencing guidelines, which in
this case established an advisory guideline range of 135 to
168 months based on an offense level of 33 and a criminal
history category of I, I'm required to consider these 3553(a)
factors.  And those are eight or nine factors established under
federal law that I'm required to consider in every case.

　　　　And the Eighth Circuit Court of Appeals, whose
decisions I read every day, has made it clear that sentencing
judges in this circuit are entitled to rely upon a vast range
of materials in addressing the 3553(a) factors.  We are
entitled to rely upon information contained in sentencing
memorandums, information contained in letters of support,

testimony of witnesses presented at hearings, including

sentencing hearings.  We're entitled to rely upon arguments of

counsel, statements from a defendant made at a sentencing

hearing.  I rely upon all of that information in addressing the

3553(a) factors.

There's no easy answer in these cases.  These are

extremely difficult cases, and again, it really depends on what

side of the courtroom you're sitting on as to what you believe

is a fair and just sentence.  And I fully recognize that every

sentence that I hand down, there's people that disagree with

it, but I try to do what I believe is fair and just, and I --

and I live with that decision.

I'm aware of my discretion and my authority to vary

from the guidelines upward or downward.  I would decline to do

so in this case.  I think the sentencing guideline range, as

determined by Congress in this type of case and based on the

amount of loss in this case, is a range that's sufficient but

not greater than necessary.  There will be many that disagree,

but these guidelines have been around for 31 years now, and

they haven't changed much in terms of how the guidelines are

calculated in these types of cases.

So pursuant to the Sentencing Reform Act of 1984,

it's the judgment of this Court, Mr. Wanner, that you shall be

committed to the custody of the Bureau of Prisons to be

imprisoned for a period of 135 months.  That's 135 months on

55

Count 1, 120 months on Count 2, which is the maximum, the
sentence to run concurrent.  I believe that's a sentence that's
sufficient but not greater than necessary.  With good behavior
you're eligible to be released after you've served 85 percent
of that sentence.

And I will recommend to the Bureau of Prisons that
they allow you to serve as much time as they deem is reasonable
in a halfway house, with work release privileges so that you
can work towards repaying the restitution that will ultimately
be ordered in this case.

It's a long time, but there's a lot of victims that
have been suffering for 15 years as well, and they're going to
continue to suffer.

And I don't know what full responsibility means
anymore either, Mr. Chase, but I oftentimes question defendants
at a sentencing hearing who tell me that they accept full
responsibility.  And to me that means they're willing to accept
anywhere up to the statutory maximum for the crime that they
committed.  I think that's what full responsibility means.  I
didn't impose the statutory max, but I imposed a sentence that
Congress has deemed to be reasonable in a case of this nature.

I'm putting you, Mr. Wanner, on supervised release
for a period of 3 years.  That's on both Counts 1 and 2, to run
concurrent, subject to a number of conditions that I'll
summarize here briefly.

56

1          I'm ordering that you pay a special assessment of

2     $200.  I'm not imposing a fine in this case.  I generally don't

3     impose fines when there's significant restitution or a

4     forfeiture involved.

12:21   5          In terms of restitution, I will leave that open for

6     60 days, as I'm allowed to do under the law.  I would encourage

7     both counsel to try to work out some stipulated agreement on

8     restitution that's owed.  If not, we'll have to hold another

9     hearing, and I'll have to sort it out.

12:22   10          In terms of the order for forfeiture in the amount of

11    three -- approximately $3.1 million, Mr. Weikum, did you have

12    any objection to that?

13          MR. WEIKUM:  Not to the order, but to -- the

14    underlying forfeiture action on the civil side needed to be

12:22   15    done with the other -- there were other individuals who have

16    interest in it, so the order of itself isn't a problem.

17          THE COURT:  All right.  So I will sign an order of

18    forfeiture and money judgment in this case ordering that the

19    defendant shall forfeit his ownership interest and rights in

12:22   20    $3,099,424.50, and that forfeiture action will have to plod

21    through the civil arena, I guess.

22          But restitution I'll hold open for 60 days and

23    strongly urge both counsel to try to work out their differences

24    and come up with a restitution amount that they can both live

12:23   25    with, and then I will order it if it's agreed upon.

The conditions of supervised release that I'm ordering are both standard conditions and special conditions. Standard conditions are ordered for every defendant that's sentenced in federal court.  They essentially require that you live a law-abiding lifestyle.  And none of the standard conditions are any that will pose any problem for you.

However, as a result of this conviction, you are prohibited for the rest of your life from possessing firearms or ammunition.  Were you aware of that?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Do you own firearms, or --

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Well, Congress, in its wisdom, has said that people convicted of felony offenses in the federal system are deemed to be prohibited persons, barred for life from possessing firearms or ammunition.  There's no exceptions or exclusions to that.  There's not a federal judge in this country that can order that that time period be shortened. It's a lifetime ban, and I don't think Congress is going to change that currently -- under the current environment in this country and the issue with firearms.

And "possession" is a broadly defined term under federal law.  It certainly means you can't own or handle guns, but you also can't be around guns.  You can't have them in the house that you're living in or places that you're visiting.

58

You can't be traveling in motor vehicles with firearms or
ammunition.

Some people are of the belief that as long as they're
not holding or using a gun, they can't be charged and convicted
of a crime of felon in possession, but those people are
ignorant of the law.  If you are in close proximity to a
firearm and arguably have access to it, in the eyes of federal
law you're deemed to be in possession of it, so you need to be
careful about where you go in life and make sure that you're
not around guns.

Special conditions I'm ordering are as follows:
You're prohibited from opening any new lines of credit unless
it's been pre-approved by the United States Probation Office.
You'll be required to disclose your -- any financial records or
information to the United States Probation Office upon their
request.

You are prohibited from engaging in any form of
gambling, including, but not included to lotteries, online
wagering, sports betting, pull tabs, horse race tracks,
off-track betting.  And you are prohibited from entering any
casino or other establishment where gambling occurs.

I'm also ordering that you are -- shall be required
to pay any outstanding monetary restitution that will be
ordered by the Court.

I'm ordering that you participate in any other form

59

of counseling or treatment that's recommended by the United

States Probation Office, including mental health treatment,

classes, programming of any sort that's recommended.

I'm ordering that you can be placed in a halfway

house at any time while on supervised release.

And last of all, you'll be subject to being searched

while you're on supervision.  Virtually everybody in this

country is subject to being searched that's on any form of

federal supervision or probation.  Some people are of the

belief that they need search warrants or probable cause or

Court order to enter one's home, but that is not the case for

people on federal supervision.  They don't have the same rights

as everybody else.

And search clauses have been challenged by hundreds

of defendants over the years, and to my knowledge, nobody's

gotten to first base on those challenges.  The United States

Supreme Court has said that people on federal supervision can

be searched any time, any place by a federal probation officer.

They may never do it in your case, but they have a right to do

it.

Any questions about the conditions of supervision

that I've ordered?

THE DEFENDANT:  No.

THE COURT:  I also need to inform you that you do

have a right to appeal.  Every defendant that's been sentenced

60

1   in the federal system has a right to appeal.  However, the time

2   period to appeal in the federal criminal justice system is

3   extremely short.  It's just 14 days, and the 14 days to appeal

4   starts to run today, as soon as I sign the final paperwork.

12:27   5   The paperwork is known as a judgment or a judgment of

6   conviction.  I'll be signing that probably in the next few

7   hours, and as soon as I sign the judgment, it gets

8   electronically filed.  The attorneys are immediately notified,

9   and that's what starts the time period to appeal.

12:28   10   If you wish to appeal, all that you need to do is

11   visit with your attorney, tell Mr. Weikum that that's the route

12   you want to take.  And all that he needs to do is file a

13   one-page, one-paragraph document known as a notice of appeal,

14   and that protects your appeal rights, but the notice of appeal

12:28   15   has to be filed within 14 days from today or you've lost your

16   right to appeal forever.  Do you understand?

17   THE DEFENDANT:  Yes.

18   THE COURT:  The Plea Agreement that you signed did

19   contain an appeal waiver provision, I believe, found in

12:28   20   paragraph 22.  And that paragraph, which I know that I reviewed

21   with you at the change of plea hearing in detail, you agreed

22   that you would give up your right of appeal in exchange for any

23   sentence up to the upper limit of the sentencing guideline

24   range that's been determined by the Court.  In other words, you

12:29   25   gave up your right of appeal for any sentence up to 168 months.

61

1      But if you feel differently, you can always appeal.

2  I don't hold it against any defendant that chooses to appeal.

3  But signing a Plea Agreement and agreeing to give up your right

4  of appeal is entering into a contract with the federal

5  government that you're going to be held to, as is any

6  defendant.  Do you have any questions about your right to

7  appeal?

8      THE DEFENDANT:  No.

9      THE COURT:  Okay.  In terms of placement, I'll

10  recommend to the Bureau of Prisons, unless attorneys tell me

11  otherwise, that they place you in a low security or most likely

12  a prison camp setting in Minnesota or South Dakota.  There's

13  two low security prison camp venues in Minnesota, Duluth and

14  Sandstone.  There's a prison camp in South Dakota -- in

15  Yankton, South Dakota, that I would guess that you'll end up

16  at, unless you want me to recommend something other.

17      MR. WEIKUM:  No, that's fine.

18      THE COURT:  All right.  In terms of his surrender,

19  what are the wishes of counsel?

20      MR. WEIKUM:  I'm sorry.  I was conferring with the

21  client.

22      THE COURT:  In terms of voluntary surrender or remand

23  into custody at this time, what are your --

24      MR. CHASE:  Your Honor, I think what Mr. Weikum is

25  suggesting makes sense.  I won't object to that.

62

1          MR. WEIKUM:  Two days?

2          THE COURT:  Two days?

3          MR. WEIKUM:  Yeah.

4          THE COURT:  Well, when I sign the paperwork, it's

12:30   5    probably going to be a couple of weeks before the Bureau of

6    Prisons designates him.

7          MR. WEIKUM:  That's fine.  We can wait until their

8    designation.  Designation can come through my office.  That's

9    fine as well.

12:31   10         THE COURT:  Well, I don't have a calendar in front of

11   me here.  Do you, Judy?

12         Mr. Wanner, I'll order that you voluntarily surrender

13   to wherever the Bureau of Prisons designates you by Friday,

14   August 24, 2018, by no later than 1 o'clock p.m.  That will

12:32   15   make sure that we've got a placement by the Bureau of Prisons

16   somewhere.  And if for some reason it doesn't occur by then,

17   we'll just have to look at a different date.

18         But when I allow people to voluntarily surrender

19   rather than take them immediately into custody, that sends a

12:32   20   strong message to the Bureau of Prisons that you're probably

21   the type of person that needs to be placed in a prison camp

22   type setting, but it also means that you have to find your way

23   to get to that federal prison.  Do you have the means to do

24   that?

12:32   25         THE DEFENDANT:  Yes, I do.

63

1          THE COURT:  Even if it's not in Minnesota or South

2     Dakota?  I don't -- I can only make recommendations to the

3     Bureau of Prisons.  They have a staff down in Oklahoma that

4     decides where everybody is going to go.

12:32    5          MR. WEIKUM:  We'll get him there.

6          THE COURT:  Pardon?

7          MR. WEIKUM:  We'll get him there.

8          THE COURT:  Okay.  Any questions, sir?

9          THE DEFENDANT:  No.

12:33   10          THE COURT:  Again, I don't -- I don't take these

11     cases lightly, and I read every letter carefully, and I --

12     they're just extremely sad cases.  I mean, I don't know your

13     wife, and I don't know your children, but they seem like

14     wonderful people that were probably completely ignorant about

12:33   15     all of the chaos that was going on here, and I feel bad for

16     them.

17          But I also feel bad for all of the innocent victims

18     that had to -- had their lives so dramatically disrupted by the

19     criminal wrongdoing that occurred in this case.  It's just sad

12:33   20     on multiple levels.

21          But I need to give both attorneys an opportunity to

22     voice any objections that they have to the sentence I've

23     ordered or any of the conditions of supervised release.  If

24     you've got objections, put them on the record.

12:33   25          MR. CHASE:  No objection, Your Honor.

64

1            MR. WEIKUM:  No objections other than was previously

2  stated in the PSI response.

3            THE COURT:  And I have adopted all of the guideline

4  calculations in the Presentence Report, which I believe was

5  accurately determined by the United States Probation Office.

6            I will sign the Order of Forfeiture here and have

7  that docketed today.

8            And, Mr. Wanner, I hope that you can get the help

9  that you need.  I hope that you can weather this well.  It's

10  usually family members that have a far more difficult time

11  weathering the imprisonment of their significant others than

12  the defendants themselves.  But I hope that you take advantage

13  of the treatment that will be made available to you in federal

14  prison as well.

15            With that we are adjourned.

16            (Proceedings concluded at 12:34 p.m., the same day.)

17            - - - - - - - - - -

18

19

20

21

22

23

24

25

1          CERTIFICATE OF COURT REPORTER

2          I, Sandra E. Ehrmantraut, a Certified Realtime

3   Reporter,

4          DO HEREBY CERTIFY that I recorded in shorthand the

5   foregoing proceedings had and made of record at the time and

6   place hereinbefore indicated.

7          I DO HEREBY FURTHER CERTIFY that the foregoing

8   typewritten pages contain an accurate transcript of my

9   shorthand notes then and there taken.

10         Dated:  September 9, 2019

11

12                           /s/ Sandra E. Ehrmantraut
                             Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25